2022 UT App 44

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RAUL RIVERA,
Appellant.

Opinion
No. 20200169-CA
Filed April 7, 2022

Fifth District Court, St. George Department
The Honorable John J. Walton
No. 191500794

Nicolas D. Turner, Attorney for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

TENNEY, Judge:

¶1 During a heated confrontation that stemmed from a longstanding family feud, Raul Rivera threatened both his brother-in-law and brother with violence and then "came at" them with a screwdriver. Rivera was later convicted of two counts of aggravated assault based on his actions.

¶2 Rivera now appeals his convictions, claiming that his trial counsel was ineffective for (1) not moving to dismiss one of the two charges on multiplicity grounds, (2) withdrawing a proposed self-defense jury instruction, and (3) not having the screwdriver tested for fingerprints. We disagree with Rivera on each front and affirm his convictions.

## BACKGROUND[1]

### *The Confrontation*

¶3    Over the course of several years, Raul Rivera had "bad blood" with David,[2] who was his brother-in-law. Rivera told various family members that he "wanted to do something" to David, and Rivera also made "threats" to David personally.

¶4    On Rivera's birthday in April 2019, Rivera called his niece (who was David's daughter) and told her that he intended "to go and put a bullet in" David.

¶5    Five days later, Rivera went to the home of Benjamin,[3] his brother. When Rivera arrived, he "was just mad." Rivera accused Benjamin of being "on David's side." He also told Benjamin that he "was no longer [Rivera's] brother," that Benjamin "was a piece of shit," and that Rivera "had a gun in his car" with "a bullet for [Benjamin] and . . . a bullet for David." In response, Benjamin told Rivera to "[j]ust leave."

¶6    While this was happening, David and his son happened to arrive at Benjamin's house to pick up Benjamin for work.

---

1. "On appeal from a jury verdict, we view the evidence and all reasonable inferences in the light most favorable to that verdict and recite the facts accordingly. We include conflicting evidence as relevant and necessary to understand the issues on appeal." *State v. Dozah*, 2016 UT App 13, ¶ 2, 368 P.3d 863 (quotation simplified).

2. A pseudonym.

3. Also a pseudonym. To enhance readability, this opinion will use this and the other pseudonym noted above throughout, and it will do so without using brackets to note any alterations when quoting from the record.

Benjamin got into David's truck as Rivera "was saying a bunch of stuff" to Benjamin. Apparently unaware that David was in the backseat, Rivera told David's son to "[t]ell David that I got something for him." Rivera then started walking to his own SUV, which was parked several yards away.

¶7    David instructed his son to drive over to Rivera's SUV and park behind it so that he and Benjamin could "[g]o see what [Rivera] want[ed]." David's son did, after which David and Benjamin got out and began walking toward Rivera's SUV.

¶8    Rivera was now sitting in his vehicle, and when he saw David and Benjamin approaching, he said, "Yeah, I got something for you," and "Yeah[,] [p]ull your gun out." Rivera then "open[ed] the door, and he grab[bed] something from the side of the door" as he exited his SUV. David and Benjamin were "standing together" at that point, with Benjamin standing just to David's left. It looked to David like Rivera was "coming after" them. He later testified: "whether [Rivera] was going to get Benjamin first or was going to get me, I don't know."

¶9    David saw that Rivera had a "chrome" "object" in his hands, and based on Rivera's past comments and threats, David "assume[d] it was the gun." So David quickly took out his own gun from his back pocket and shot Rivera.

¶10    Benjamin called 911. At the request of the 911 dispatcher, David put his gun inside the house. When police arrived soon after, "David stepped forward and said, 'It was me,'" clearly indicating that he was the shooter. For his part, Rivera was transported to the hospital and treated for the gunshot wound.

¶11    While investigating the scene, officers found no other gun besides David's. They did, however, find a black and chrome screwdriver lying directly beneath the hinge of the driver-side door of Rivera's SUV.

*The Trial*

¶12    The State charged Rivera with two counts of aggravated assault—one count for assaulting David and one count for assaulting Benjamin. The State did not file charges against David for shooting Rivera.

¶13    Before trial, Rivera's counsel (Counsel) included a self-defense instruction in the proposed jury instructions, with the theory apparently being that Rivera was acting in self-defense when he exited his SUV with the screwdriver. During trial, however, Counsel informed the judge that Rivera wouldn't be testifying. When Counsel then asked the judge to "minus the self-defense" instruction, the court removed it.

¶14    Rather than pursuing a self-defense theory, Counsel advanced a different theory at trial: namely, that Rivera "didn't come out [of his SUV] with a screwdriver" at all, that David had shot him unprovoked, and that David and Benjamin had planted the screwdriver under the SUV after the shooting to "back their story up."

¶15    To support this theory, Counsel cross-examined David, Benjamin, and the testifying police officer about the position of the screwdriver, whether someone had placed it there or moved it after Rivera allegedly dropped it, and whether it had been tested by police to see if fingerprints from anyone other than Rivera were on it. Counsel also repeatedly asked these witnesses why the screwdriver was found directly beneath the SUV's driver-side door instead of farther away from the vehicle. Through questioning, Counsel suggested that if Rivera really did "come at" David and Benjamin, Rivera's "natural momentum" should have caused the screwdriver to land farther away from the SUV after he was shot.

¶16    In further support of this theory, Counsel called a private investigator as a defense witness. In his testimony, the

investigator opined that the screwdriver should have been "in a different spot" if Rivera had been shot while approaching David and Benjamin as they claimed.

¶17 Counsel also pressed the testifying police officer about the screwdriver and the State's failure to "fingerprint[] or analyze[] [it] in any way, shape, or form." Counsel pointed out that "nothing" "prevent[ed] someone from getting the screwdriver out of [the SUV] and dropping it somewhere" after the shooting, and he likewise pointed out that "we wouldn't know" whether Benjamin's or David's fingerprints were on it because the State hadn't "fingerprinted it."

¶18 During closing argument, Counsel combined these points to argue that if Rivera was "coming out and lunging and gets shot and drops where he's shot at, that screwdriver" should not have been found under the driver-side door. "It doesn't make sense," Counsel urged. But "[w]hat does make sense," he argued, "is that here's two individuals who say they've been threatened and having to deal with [Rivera's] B.S. for all this" time and who chose to "deal with it" by "shoot[ing] him."

¶19 As he had done through questioning, Counsel also criticized the State for not testing the screwdriver to determine if either David's or Benjamin's fingerprints were on it. This was suspicious, Counsel argued, because David and Benjamin "could have easily got that screwdriver out of [Rivera's] car and put it there to back their story up," noting that "[t]hey had time to do this before cops even got there." Counsel claimed that the State had put "little blinders on" and had erroneously focused its investigation on Rivera when it should have been investigating David and Benjamin instead.

¶20 After deliberations, the jury convicted Rivera of both counts of aggravated assault. Rivera now appeals his convictions.

ISSUES AND STANDARD OF REVIEW

¶21    Rivera argues that Counsel was ineffective on several grounds. When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law. *See State v. Drommond*, 2020 UT 50, ¶ 46, 469 P.3d 1056.[4]

ANALYSIS

¶22    "To succeed on his ineffective assistance of counsel claim," a defendant "must show that (1) trial counsel rendered deficient performance which fell below an objective standard of reasonable professional judgment, and (2) counsel's deficient performance prejudiced him." *State v. Selzer*, 2013 UT App 3, ¶ 16, 294 P.3d 617 (quotation simplified). This requires the defendant to identify the "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment" and then "show[ ] that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland v. Washington*, 466 U.S. 668, 687, 690 (1984). "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address . . . either prong" in our review. *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182.

---

4. Rivera also briefly argues that the State "failed in its duty to investigate" by not (1) submitting the screwdriver for fingerprinting or (2) calling Rivera's other brother to testify. But these arguments are not preserved, and Rivera has not argued that an exception to the preservation rule applies to excuse the failure to raise them below. We accordingly decline to address these arguments. *See State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443 (explaining that "[t]his court has recognized three distinct exceptions to preservation," and when "an issue is not preserved in the trial court, but a party seeks to raise it on appeal, the party must establish the applicability of one of these exceptions").

¶23 Here, Rivera argues that Counsel was ineffective for (1) not moving to dismiss one of the two aggravated assault counts on multiplicity grounds, (2) withdrawing the self-defense jury instruction, and (3) not submitting the screwdriver for fingerprinting. We address each argument in turn.

## I. Multiplicity

¶24 Rivera first argues that Counsel was ineffective for not moving to dismiss one of the two aggravated assault charges on multiplicity grounds. An ineffective assistance claim fails, however, when the proposed motion would have been futile. *See State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 ("[I]t is not unreasonable for counsel to choose not to make a motion that would not have been granted."). This was so here.

¶25 One of the protections embodied in the Double Jeopardy Clause of the United States Constitution is the "protect[ion] against multiple punishments for the same offense." *State v. Prion*, 2012 UT 15, ¶ 30, 274 P.3d 919 (quotation simplified). "The rule against multiplicity" is derived from this, and it "is violated if the State punishes a defendant for more counts of an offense than are allowed by the intended unit of prosecution for that offense." *State v. Rasabout*, 2015 UT 72, ¶ 26, 356 P.3d 1258; *see also State v. Calvert*, 2017 UT App 212, ¶ 33, 407 P.3d 1098 (recognizing that the rule against multiplicity is violated "when a single offense is charged in several counts" (quotation simplified)).

¶26 "[I]dentifying the allowable unit of prosecution for an offense" presents "a question of statutory construction." *Rasabout*, 2015 UT 72, ¶ 10. In this sense, our "evaluation of a multiplicity claim requires analysis of the statutes under which a criminal defendant is charged." *State v. Hattrich*, 2013 UT App 177, ¶ 33, 317 P.3d 433. We "seek to give effect to the intent of the Legislature" in such an analysis, and to "ascertain that intent, we look first to the text of the statute within its context." *Rasabout*, 2015 UT 72, ¶ 26.

¶27    The offense in question here is aggravated assault. By statute, a person commits aggravated assault if he uses "a dangerous weapon" to (1) "attempt, with unlawful force or violence, to do bodily injury to another"; (2) "threat[en]," with "a show of immediate force or violence, to do bodily injury to another"; or (3) commit an "act . . . with unlawful force or violence, that causes bodily injury to another or creates a substantial risk of bodily injury to another." Utah Code Ann. § 76-5-103(1)(a)(i)–(iii) (LexisNexis 2017); *id*. § 76-5-103(1)(b)(i). A "dangerous weapon" includes "any item capable of causing death or serious bodily injury." *Id.* § 76-1-601(7)(a).

¶28    Rivera claims that under a multiplicity analysis, there could only be one count of aggravated assault in this case because he was charged based on "one single movement" that involved just "a single screwdriver." But Rivera's interpretation of the allowable unit of prosecution for this offense is unduly restrictive.

¶29    For crimes "against the person," "offenses committed against multiple victims are not the same," and "a single criminal act or episode" can "constitute as many offenses as there are victims." *State v. James*, 631 P.2d 854, 855–56 (Utah 1981). As noted, the aggravated assault statute has three variants. Notably, all three criminalize an unlawful act against "another." Utah Code Ann. § 76-5-103(1)(a)(i)–(iii). In *State v. Mane*, 783 P.2d 61, 64–65 (Utah Ct. App. 1989), we interpreted the statute's reference to "another" as being a reference to "a singular victim." From this, we held that there can be multiple aggravated assault counts in a case if there were multiple victims of the unlawful conduct. *Id.*

¶30    Here, in the run-up to the confrontation at issue, Rivera said that he had "a bullet" for both David and Benjamin. As the two men approached Rivera's SUV at the beginning of the confrontation itself, Rivera said: "I got something for you" and "[p]ull your gun out." Rivera then opened his door, "grab[bed] something from the side of the door," and began "coming after"

them with a "chrome" "object." Rivera's advance was stopped only because David shot him.

¶31   This established that David and Benjamin were both victims on either of two fronts: first, Rivera "threat[ened]" to "do bodily injury" to both of them, accompanied by a show of immediate force; and second, by "coming after" them with a dangerous weapon, Rivera "attempt[ed]" to "do bodily injury" to both of them with unlawful force or violence. Utah Code Ann. § 76-5-103(1)(a)(i)–(ii).

¶32   Resisting this, Rivera argues that he was "incapable of doing harm to both given the limitations of the 'weapon' he was wielding"—i.e., the screwdriver. But the jury concluded otherwise, and for good reason. When Rivera came after David and Benjamin with the screwdriver, the two were "standing together." Given that Rivera had just threatened both of them with "a bullet," a reasonable jury could conclude that he was now "coming after" both of them with the intent to harm both of them. So if Rivera hadn't been stopped, he could indeed have harmed both of them with either a single extended swipe of the screwdriver or with rapidly successive stabs. This was enough to constitute either a threat to harm or an attempt to harm David and Benjamin, thereby making both victims under the statute.

¶33   In short, a multiplicity analysis turns on the allowable unit of prosecution, and the unit of prosecution for aggravated assault includes a separate count for each victim. Because there were two victims here, "a motion to dismiss on the basis of multiplicity would have been denied." *Calvert*, 2017 UT App 212, ¶ 34. Counsel therefore "did not perform deficiently by failing to pursue that line of argument." *Id.*

## II. Self-Defense Jury Instruction

¶34 Rivera next argues that Counsel was ineffective for withdrawing the proposed self-defense jury instruction. We disagree.

¶35 Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. This is so because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688–89. A "set of rules" "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id*. at 689.

¶36 Despite this latitude, Rivera claims that "[i]t cannot be classified as reasonable or conceivable trial strategy" in this case for Counsel to have withdrawn the self-defense jury instruction. We disagree.

¶37 A defense attorney's informed strategic choice is "virtually unchallengeable." *Id.* at 690. If it even "appears counsel's actions *could* have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871 (emphasis added); *see also State v. Wright*, 2013 UT App 142, ¶ 20, 304 P.3d 887 ("We will not conclude that trial counsel was ineffective unless there is a lack of any conceivable tactical basis for counsel's actions." (Quotation simplified.)).

¶38 When we evaluate choice-of-strategy claims like Rivera's, it "is not appropriate" for us, "in hindsight, to second guess the strategy of defense counsel." *State v. Moore,* 2012 UT App 227, ¶ 8, 285 P.3d 809. This is so because the "calculations of counsel in

weighing the pros and cons of one strategy over another" are, "in essence, a judgment about what is most likely to work to the client's benefit in a complex trial process that requires that many choices be made." *State v. Montoya*, 2017 UT App 110, ¶ 26, 400 P.3d 1193. As a result, a "decision by counsel that reasonably weighs the risks and benefits of available strategic approaches before choosing one as preferable to others cannot support a claim that counsel was deficient in either strategy or performance, even if the approach did not lead to the desired result." *State v. Franco*, 2012 UT App 200, ¶ 10, 283 P.3d 1004; *see also Archuleta v. Galetka*, 2011 UT 73, ¶ 138, 267 P.3d 232 (concluding that counsel did not perform deficiently by preferring "an innocence over a mitigation strategy," because the mitigation evidence created "significant difficulties" for the innocence strategy). In such cases, so long as counsel could have reasonably chosen the strategy in question, and so long as the strategy is itself reasonable, the claim must fail.

¶39 This is so here. Counsel's theory of the case was that Rivera "didn't come out [of his SUV] with a screwdriver" at all. As discussed, Counsel supported this theory by asking targeted questions of State witnesses during cross-examination, as well as by calling an expert witness of his own who opined that the State's theory didn't line up with the physical evidence. Counsel then actively advanced this theory during closing argument.

¶40 The self-defense theory that Rivera now proposes on appeal would have run contrary to this. After all, the proposed self-defense argument would have been that Rivera *did* come out of his SUV with the screwdriver, but that he was justified in doing so as an act of self-defense.

¶41 Counsel's "wide latitude" to "mak[e] tactical decisions" surely included the ability to protect the integrity of his preferred theory of the case by not simultaneously advancing a contradictory one. *Strickland*, 466 U.S. at 689. Indeed, in a past case, we regarded a similar "election between inconsistent

defenses" as a "legitimate exercise of trial strategy rather than ineffective assistance of counsel." *State v. Pascual*, 804 P.2d 553, 556 (Utah Ct. App. 1991). The same is true here, and Counsel therefore did not perform deficiently by withdrawing the self-defense jury instruction.

### III. Fingerprint Testing

¶42 Finally, Rivera claims that Counsel was ineffective for not having the screwdriver tested for fingerprints. Rivera suggests that such testing might have shown that there were fingerprints from David or Benjamin; if there were, Rivera argues that this would have supported his theory that David and Benjamin planted the screwdriver.

¶43 But this claim is entirely speculative. "[P]roof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *Fernandez v. Cook*, 870 P.2d 870, 877 (Utah 1993). An absence of evidence matters to both *Strickland* elements. On deficient performance, it "should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quotation simplified). So too with prejudice. Speculation is not a "substitute for proof of prejudice," *State v. Arguelles*, 921 P.2d 439, 441 (Utah 1996), and "[p]roof of prejudice" "may not be based purely upon a speculative matter." *State v. Strode*, 2011 UT App 368, ¶ 4, 264 P.3d 562.

¶44 Rivera never has submitted the screwdriver for fingerprinting, so there is no evidence in the record that establishes what fingerprints were (or were not) on it. As a result, the record does not support his claim that testing would have uncovered any helpful evidence for him. For this reason alone, he has not shown either deficient performance or prejudice.

¶45 This claim also fails because Counsel could have reasonably decided to not test the screwdriver for his own strategic reasons. As noted, Counsel used the lack of testing to support the defense's theory at trial. He did so in two particular ways: first, the lack of testing allowed him to fault the State for investigatory myopia; and second, it allowed Counsel to suggest that testing might have shown that fingerprints from David or Benjamin were on the screwdriver. But if Counsel had tested the screwdriver, and if those tests had not uncovered fingerprints from David or Benjamin, this would have impaired (if not eliminated) his ability to make that second argument.

¶46 Rather than running that risk, Counsel could have reasonably decided to not test the screwdriver at all, thereby allowing him to advance the complete version of his preferred argument. For this additional reason, Rivera's argument fails.

CONCLUSION

¶47 Rivera has not shown that his Counsel performed ineffectively by (1) not moving to dismiss one of the aggravated assault counts on multiplicity grounds, (2) removing the self-defense jury instruction, or (3) not submitting the screwdriver for fingerprinting. We accordingly affirm Rivera's convictions.

———————